'would have been, that these acts should remain in force, as to such districts and vessels, not that some provisions, which relate to them, should remain in force. What are provisions, which relate to a particular subject? Certainly the answer must be, such provisions as definitely point to that subject, not such as embrace whole classes of subjects. Indeed, on a careful inspection, I am not sure, that the exception is not yet of a more narrow construction, and ought not to be restrained to the last preceding clause, to wit, that relative to detentions on account of the nature of the cargoes of vessels. In this view, the act would take from collectors all power to detain vessels, unless in districts adjacent to a foreign territory, or in cases of vessels bound or belonging to such districts. However, I incline to adhere to that which the counsel for the claimants have so elaborately expounded.

On the whole I cannot but consider the words of the enacting clause, "so much of the acts," &c. as meaning, so many provisions of the acts, and the words of the exception. as excluding the enumerated provisions from the operation of that clause. The former sweep away all general provisions, and the latter save those only, which point specially and distinctly to a particular purpose. If the construction of the act were even doubtful, I should unhesitatingly pronounce the same decision. When the legislature speak in clear and distinct terms, I am bound and with cheerfulness shall obey them. But when they choose "spargere ambiguas voces," I know no duty imposed on a court, to hunt through dark and doubtful passages, to catch a glimmering meaning, whereby to load the citizen with penalties and forfeitures. In a doubtful case, it is a sound rule of construction, that the words are to be expounded in favor of the citizen, and against the legislators.

I affirm the decree of the district court restoring the property.

## Case No. 4,632.

The FAME.

[See Case No. 7,845.]

## Case No. 4,633.

The FAME.

[1 Brown, Adm. 42.]¹

District Court, D. Michigan. Dec., 1858.

Jos. Miller, Jr., Dist. Atty., for the United States.

Levi Bishop, for claimant.

¹ [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

WILKINS, District Judge. I regret the necessity of condemning the Fame, but the statute is imperative. The first count is based upon the 1st section of the act of 1821, and the facts clearly establish a violation of its provisions. The Fame sailed from the port of Amherstburg, in Canada, bound for Detroit, with 200 barrels of whisky, ten kegs of gin and five of brandy, all of Canadian manufacture, and failed to deliver her manifest to the collector at Detroit, where the nearest customs office was located. The excuse is that the liquors were not intended to be imported into the United States, but were designed to be transhipped into another vessel bound to a Canadian port. Of this intention I have no doubt; yet the master was bound to deliver his manifest when lying at or off the port. Such merchandise was subject to duty, had an importation been intended, and from the "Report Outwards," signed and verified by the master at Amherstburg, it appears the vessel was consigned to Detroit. As no other destination is mentioned for the liquors, they must be presumed to have been consigned to the same place. Foreign liquors are subject to duty; and although this freight was clearly intended elsewhere, yet such intention proved by oral testimony, contrary to the ship's papers, cannot be admitted as an excuse for a palpable violation of the statute. It would open the door to a vast amount of fraud upon the revenue.

But had I any doubt as to the 1st count, the second is sustained beyond all question. The cargo is of greater value than $400, and the proofs establish the fact that she was unladened within the United States, at midnight, without license or permit. I say unladened, for the steamer Ploughboy was lying at the dock at Port Huron, where the Fame transhipped her cargo. It is contended that this transhipment is not an unlading within the meaning and spirit of the 50th section of the act of 1799. It is true the cargo was not landed in the literal sense of the word—i. e., placed on shore—but it was taken from one vessel to the other while both were in port. This was clearly a landing within the intent of the statute, which was designed to prevent frauds upon the revenue. It was easy for the master to procure a permit, and thus save his owners from this prosecution. But the court cannot make the law bend to the convenience of masters. Decree of condemnation.

## Case No. 4,634.

### The FAME.

[3 Mason, 147.] [1]

Circuit Court, D. Maine. Oct. Term, 1822.

